IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


ALLEN RAY KING,
      Plaintiff,

vs.                                                 Case No.: 5:09cv365/MCR/EMT

MARK HENRY, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Allen Ray King ("King") proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983.  Presently before the court is the Motion for Summary Judgment filed by Defendants (doc. 55).  King filed a Response in opposition to the motion (doc. 57).  As set forth below, the court recommends that Defendants' Motion for Summary Judgment be granted.

I.      BACKGROUND

      King, an inmate of the Florida Department of Corrections ("FDOC"), initiated this action by filing a civil rights complaint on November 4, 2009 (doc. 1).  The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive motions.  *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b).  In the Second Amended Complaint (doc. 24), which is the operative pleading in this case, King names three Defendants:  Mark Henry, Warden of Graceville Correctional Facility ("GCF"); Tony Stewart, Chief of Security at GCF; and George Zoley, CEO of The GEO Group, Inc., a private corporation that managed GCF at the time of the events giving rise to this action (*id.*).  King alleges Defendants violated his Eighth Amendment rights by exposing him to environmental tobacco smoke ("ETS") (*id.*).  He specifically claims Mr.

Zoley's policies resulted in deliberate indifference to his present and future health (*id.*); and Colonel Stewart and Warden Henry's failure to enforce GCF's non-smoking policies and failure to adequately ventilate his housing unit constituted deliberate indifference to his present and future health (*id.*).[1]  As relief, King seeks compensatory and punitive damages (*id.*).[2]

Defendants previously filed a motion to dismiss or for summary judgment (doc. 42).  The undersigned issued an advisement order informing the parties of the importance and ramifications of summary judgment consideration and providing them with information as to the requirements for materials submitted for Rule 56 review (doc. 44).  King filed his response in opposition to the motion (doc. 47).  The undersigned issued a Report and Recommendation recommending that Defendants' motion be denied as to Warden Henry and Colonel Stewart and granted as to Mr. Zoley (doc. 52).  The district judge adopted the Report and Recommendation, except to the extent it found that King's claims against Mr. Zoley should be dismissed for failure to state a claim (*see* doc. 56).  The district judge agreed that King's Second Amended Complaint failed to state a claim against Zoley but found that King should be allowed an opportunity to amend him complaint in an effort to do so.  The district judge provided King thirty (30) days from June 24, 2011 (or until July 24, 2011) to "file a third amended complaint against Mr. Zoley so that the court can determine whether he has stated a viable claim against him" (*id.*).  The district judge advised King that his failure to do so would result in dismissal of his claim against Defendant Zoley (*id.*).  King has not filed a third amended complaint.

While the Report and Recommendation was pending before the district judge, Defendants filed a motion for summary judgment (doc. 55).  King filed a response in opposition to the motion (doc. 57).  The undersigned issued an order on August 16, 2011, notifying the parties that the court would take the motion under advisement on September 6, 2011, pursuant to Fed. R. Civ. P. 56 and Rule 56.1(B) of the Local Rules (doc. 59).  The court notified the parties that they must file and

---

[1] King also claimed that Defendants violated the Eighth Amendment by exposing him to cold temperatures in his cell and removing him from the vegan diet program (*see* doc. 24).  On October 29, 2010, the court dismissed the claims concerning exposure to cold temperatures and removal from the vegan diet program, thus leaving King's ETS claim as the only surviving claim (*see* docs. 26, 29).

[2] King does not state whether Defendants are sued in thier individual or official capacities; the undersigned will therefore address his claims as if Defendants are sued in both capacities.

serve affidavits and any other additional summary judgment materials on or before that date, or it would not be considered by the court barring exceptional circumstances (*id.*).  None of the parties submitted additional materials.

## II.   MATERIAL FACTS

As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to King, the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).  The court conveys only those facts that are material.

With regard to the factual positions asserted by the parties, the court applies the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).[3]  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Defendants' motion and supporting materials—including the facts considered undisputed—show that Defendants are entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).  Applying these standards, the court conveys the following as the material facts.

On April 11, 2008, prior to King's arrival at GCF, an associate warden issued a memorandum to inmates announcing that the administration was considering designating one "quad" in each housing unit as a "non-smoking quad," meaning inmates living in the quad would not have the ability to purchase tobacco products (doc. 55, Ex. J, memorandum from A. Sims, Assistant Warden of Programs).  The announcement stated that the intent of this administrative action was to create a "true, smoke-free environment" in each housing unit (*id.*).  GCF was under no requirement to create non-smoking quads (doc. 55, Ex. I, Affidavit of Warden Mark Henry ¶ 4).  Prior to creation of the non-smoking quads, Florida law and GCF policies prohibited smoking indoors at GCF (doc. 55, Ex. G, Affidavit of Tony F. Stewart ¶ 7; Henry Aff. ¶¶ 5, 6).  The creation of a non-smoking quad was a step toward eliminating tobacco use at GCF (Henry Aff. ¶¶ 4, 6).  Inmates wishing to be housed in the non-smoking quad were required to sign a pledge stating they would remain tobacco free (Henry Aff. ¶ 4).

---

[3] With regard to the pleadings and evidentiary materials on file, the court makes four observations.  First, any facts included in Defendants Henry and Stewart's statement of material facts that are not controverted in King's response are deemed admitted.  *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party).  Second, any statements of fact asserted by King in his response to the motion for summary judgment (doc. 57) may not be considered summary judgment evidence because his response was not verified.  Third, several of the documents submitted by King with his response are irrelevant to the issues in this lawsuit.  For example, Exhibit A is a grievance King filed with the medical department concerning a delay in scheduling prostate surgery and his removal from the vegan diet program.  Exhibits E and F are grievances King filed with the medical department on September 28, 2008 and October 26, 2008, complaining that on September 20, 2008, Nurse Womble told him there was nothing wrong with him when he complained he had experienced burning lungs, rapid heart rate, sharp pains in his chest, a deep cough, low energy, dizziness, nausea, and loss of appetite, after being exposed to cigarette smoke, and on September 25, 2008, Nurse Womble diagnosed him as constipated when he complained of dizziness, nausea, and low energy.  Exhibits I, J, K, T, U, W, and X are grievances King filed concerning issues that were previously dismissed from this lawsuit, namely, his removal from the vegan diet program and inadequate heat in his dormitory.  Finally, any factual statements by King included in the documents he submitted in support of his response, which King offers for the for the truth of the matter asserted, may not be considered, because the statements are not verified and constitute hearsay.

Prior to King's arrival at GCF, he had no respiratory problems (doc. 24 at 6); however, he admitted to medical staff at GCF that he is a former smoker (doc. 55, Ex. K, Affidavit of Galina Kats-Kagan, M.D. ¶ 6). On August 18, 2008, King reported to the medical department complaining of symptoms which he described as "comparative to a heart attack" (doc. 24 at 6). At the direction of Dr. Kats-Kagan, he was taken to a local hospital, where tests ruled out a heart attack but confirmed symptoms of lung irritation, stress, fatigue, and sleep deprivation (doc. 24 at 6; doc. 55 at 5). Upon King's return to GCF the next day, Nurse Practitioner Alexander recommended less stress and more sleep (doc. 24 at 6). Nurse Alexander never viewed King as suffering from a serious life threatening condition requiring him to reside in a smoke-free environment (doc. 55, Ex. A, Affidavit of Melanie Alexander ¶ 7). However, the parties dispute whether Nurse Alexander ever told King that he suffered from a serious life threatening condition. King states Alexander told him that if his symptoms continued and went untreated, he could die (doc. 24 at 6). Nurse Alexander states she never told King he suffered from a serious life threatening condition (Alexander Aff. ¶ 7).

A non-smoking quad was established at GCF in approximately September of 2008 (Stewart Aff. ¶ 8; Henry Aff. ¶ 4). The parties do not dispute that King was assigned to the non-smoking quad and has remained there since. Inmates assigned to the quad were prohibited from purchasing tobacco products (Henry Aff. ¶ 4). The non-smoking quad was perceived as a privilege among inmates, because those quads were quieter (Stewart Aff. ¶ 8; Henry Aff. ¶ 7). Inmates assigned to the non-smoking quad did not have a separate recreation yard and were not segregated from other inmates while in the recreation yard (Henry Aff. ¶ 8). A commissary is located in the recreation yard, and many inmates assigned to the non-smoking quad violated their pledge and purchased tobacco products from that commissary (Stewart Aff. ¶ 9; Henry Aff. ¶ 8). Elimination of all cigarette smoking inside the dormitories was a difficult and continuous battle (*id.*). Inmates would smuggle cigarettes into the non-smoking quad (*id.*). On occasion, inmates would even hide cigarettes and lighted wicks in their pants and body cavities to avoid detection by correctional officers searching them before re-entering the quad (*id.*).

Multiple, progressive steps were taken by correctional staff to eliminate cigarette smoking inside the dormitories (Stewart Aff. ¶¶ 6, 7, 8, 10, 11, 12; Henry Aff. ¶¶ 4, 5, 6, 8, 9). These steps

included, but were not limited to, creating non-smoking quads inside the dormitories, correctional officer patrols of the dormitories every half hour, daily searches of inmates and inmate possessions, relocation of inmates found smoking inside dormitories, discipline of inmates caught smoking inside dormitories, and relocation of inmates found in possession of tobacco products (Stewart Aff. ¶ 11; Henry Aff. ¶9). Discipline for inmates housed in the non-smoking quads caught smoking or in possession of tobacco products ranged from disciplinary reports to loss of gain time to removal from the non-smoking quad (Stewart Aff. ¶ 12; Henry Aff. ¶ 9). If cigarette smoke was found inside a cell and neither inmate assigned to the cell would state who possessed the cigarettes, staff was directed to discipline both inmates (Henry Aff. ¶ 9). Additionally, "shake downs" of the entire quad occurred if cigarette smoke was detected, but the inmate who smoked the cigarette could not be determined (*id.*). Other forms of discipline included punishing the entire quad by taking away inmate privileges, such as use of microwave ovens and televisions if the identity of the inmate who smoked in the quad could not be determined (Stewart Aff. ¶ 12; Henry Aff. ¶ 9). During Warden Henry's tenure at GCF, from February 24, 2008 to September 27, 2010, hundreds of disciplinary reports were written for inmates violating the non-smoking policy (Henry Aff. ¶¶ 3, 9).

It was very difficult, if not impossible, to catch every inmate who smoked in the non-smoking quad, because there were approximately 100 inmates in the quad, and it was difficult to catch inmates in the act of violating the non-smoking policy (Stewart Aff. ¶ 10; Henry Aff. ¶ 10). Therefore, inmates were encouraged to notify security staff if they saw another inmate smoking inside the quad (*id.*). Inmates were also informed that they could leave an anonymous grievance identifying the inmate or inmates found smoking inside the non-smoking quad (Stewart Aff. ¶ 13; Henry Aff. ¶ 10). Warden Henry personally checked the anonymous grievances every morning to determine if there were any inmates violating the non-smoking policy (Henry Aff. ¶ 10). If an inmate violator was identified, the matter was investigated (Stewart Aff. ¶¶ 13, 15; Henry Aff. ¶ 10). Warden Henry and Colonel Stewart sought assistance from King regarding the identification of inmates violating the non-smoking policy (*see* doc. 55, Exs. F, H). King does not allege he directly provided Henry or Stewart with the identify of any inmate who was smoking in the non-smoking quad, or that he utilized the anonymous grievance procedure for reporting inmate violators.

On September 21, 2008, King filed an informal grievance with Ms. Durrance, the Grievance Coordinator at GCF, stating that several unidentified inmates and institutional staff members were violating Florida Statutes Section 944.115 (the state statute prohibiting smoking inside state correctional facilities, including privately operated correctional institutions) and Rule 33-401.401 of the Florida Administrative Code (the administrative policy of the Florida Department of Corrections ("FDOC") regarding tobacco use) (doc. 55, Ex. B; doc. 57, Ex. C).[4, 5] King complained

---

[4] Section 944.115 provides, in relevant part:

(3)(a) An inmate within a state correctional facility [meaning a state or privately operated correctional institution] may not use tobacco products in prohibited areas [meaning any indoor areas of any building, portable, or other enclosed structure] within a state correctional facility at any time while in the custody of the department or under the supervision of a private vendor operating a correctional facility.

(b)  1.  An employee or visitor may not use any tobacco products in prohibited areas.

2.  The warden or supervisor of a state correctional facility shall take reasonable steps to ensure that the tobacco prohibition for employees and visitors is strictly enforced.

(4) An inmate who violates this section commits a disciplinary infraction and is subject to punishment determined to be appropriate by the disciplinary authority in the state correctional facility, including, but not limited to, forfeiture of gain-time or the right to earn gain-time in the future under s. 944.28.

(5)  The department may adopt rules and the private vendors operating correctional facilities may adopt policies and procedures for the implementation of this section, the designation of prohibited areas and smoking areas, and for the imposition of the following penalties:

(a)  Inmates who violate this section will be subject to disciplinary action as provided by rule and in accordance with this section.

(b) Employees who violate this section will be subject to disciplinary action as provided by rule.

Fla. Stat. § 944.114(3).

[5] Rule 33-401.401 provides, in relevant part:

(1)  This rule establishes the tobacco products use policy for the Department of Corrections.  For the purposes of this rule, "tobacco products" means items such as cigars, cigarettes, snuff, loose tobacco, or similar goods made with any part of the tobacco plant, which are prepared or used for smoking, chewing, dipping, sniffing, or other personal use.

(2)(a)  Pursuant to Section 944.115, F.S., use of any tobacco products shall be prohibited in all indoor areas of any building or office within a state correctional facility except for employee housing on department grounds and inmate maximum security (death row) housing areas. . . .

he had been in the hospital the previous month and had been diagnosed with "irritated lungs with fluid build up" and a stress-related sleeping disorder; and the violations of the non-smoking policies were "causing [him] health problems" (*id.*).  He stated that a doctor had recommended he take medication to help him sleep (*id.*).  King stated that during the two-month period prior to his being assigned to a non-smoking quad (April 30 to July 2, 2008), the tobacco smoke in the air was "horrendous" and the ventilation was poor (*id.*).  He stated he immediately began to experience shortness of breath, loss of energy, chest pain, high blood pressure, and irregular heartbeat (*id.*). King complained that inmates who smoked and had not requested assignment to the non-smoking quad had been assigned there (*id.*).  He also complained that staff continued to assign newly arriving inmates and "confinement releasees" to the non-smoking quad without questioning them about their tobacco use, and these inmates were smokers (*id.*).  King complained that correctional officers did not make a good faith effort to enforce Fla. Stat. § 955.14 or F.A.C. r. 33-401.401 (*id.*).  He complained that smoking in prohibited areas was a widespread problem, with inmates smoking while correctional officers were present in the non-smoking dorms (*id.*).  He stated that 60% of the population in the non-smoking quad smoked when and where they pleased (*id.*).  King complained that smokers were threatening and beating non-smokers when non-smokers complained (*id.*).  He also complained that inmates and staff (including officers, doctors, captains, lieutenants, sergeants, and administrative staff) were smoking in other areas where smoking was prohibited by state and federal law (including indoor and outdoor areas), and no one advised them that this violated the law

---

(b)  Pursuant to Section 386.204, F.S., smoking is prohibited in all enclosed indoor workplaces as defined in Section 386.203, F.S.

(3)  Should Department of Corrections' offices be located in buildings not totally in the control of the department, smoking shall be prohibited in all enclosed indoor workplaces occupied or controlled by the department.  Employees may not smoke in areas which do not fully meet the requirements of the Florida Indoor Clean Air Act, Sections 386.201-.209, F.S.

(4)  Outdoor areas owned or leased by the Department of Corrections may be designated by the secretary or the secretary's designee as areas where tobacco products may be used by inmates, staff, or visitors. . . . .

(9)  Violation of this rule shall be grounds for disciplinary action against employees and inmates.

Fla. Admin. Code r. 33.401.401 (2008).

(*id.*).[6]  King complained that this lack of enforcement forced him to stand in line and walk through "a cloud of smoke" in those areas (*id.*).  King requested numerous forms of relief, including an order to all correctional officers to enforce the law by suspending privileges of and initiating disciplinary action against those inmates caught smoking in prohibited areas, removal of all smokers from non-smoking quads, posting of non-smoking signs in all areas where smoking was prohibited, and posting of memoranda to inmates warning them of the consequences of smoking in prohibited areas (*id.*).

The next day, September 22, 2008, Defendant Stewart responded to King's informal grievance (doc. 55, Ex. B).  Stewart stated that security officers had removed several inmates from the non-smoking quads and taken disciplinary action against many violators (*id.*).  He additionally stated that inmates from confinement were assigned to the non-smoking quad if there were no other available bunks; and newly arriving inmates were assigned to open bunks (*id.*).  He stated the security staff was diligently handling the issue (*id.*).

On September 25, 2008, King again experienced symptoms of lung irritation, stress, fatigue, and sleep deprivation, and he had also developed a bad cough, nausea and "feelings of losing consciousness" (doc. 24 at 6).  King alleges Nurse Womble advised him to avoid environmental tobacco smoke ("ETS") (*id.*).[7]

On September 27, 2008, King filed an "informal grievance appeal" of the denial of his September 21 grievance (doc. 55, Ex. C; doc. 57, Ex. N).  He repeated the complaints included in his previous grievance (*id.*).  On September 30, 2008, Defendant Stewart responded that the security staff was making every effort to remove smoking inmates from the non-smoking quad; officers were not allowing smoking in the dorms; and they were following the disciplinary procedures set forth in FDOC administrative rules (*id.*).  Stewart stated that inmates were no longer being placed in the

---

[6] King stated in his grievance that federal law prohibited smoking within twenty-five (25) feet of certain areas. Federal regulations prohibit smoking within 25 feet of doorways and air intake ducts on outdoor space under the jurisdiction, custody or control of the General Services Administration ("GSA").  *See* 41 C.F.R. § 102-74.330 (2008) (effective June 19, 2009).  However, GCF was never under the jurisdiction, custody or control of the GSA.

[7] King filed grievances with the medical department concerning Nurse Womble's treatment of him on that day (*see* doc. 57, Exs. E, F).  Notably, King never mentioned that Nurse Womble told him to avoid ETS.  He stated she diagnosed him with constipation and recommended he drink more water.

non-smoking quad when they were discharged from confinement unless they had previously been housed there and were non-smokers (*id.*).  Stewart acknowledged that smoking was prohibited inside the buildings, but stated smokers would not be denied access to the recreation field, the "pavilion," and the canteen (*id.*).  He also stated that numerous non-smoking signs were posted in the facility; and officers disciplined violators (*id.*) (King states non-smoking signs were not posted until October 3, 2008, three days after Stewart's response to his grievance (*see* doc. 24 at 17)).  Stewart stated that staff was advised where smoking was permitted (for example, outside the administration building), and he was not aware that any staff members smoked in prohibited areas, such as in the hallway next to the property room or under the overhang of the administration building (doc. 55, Ex. C).

On October 9, 2008, King appealed his denied informal grievances to Warden Henry, complaining that members of the institutional staff were knowingly violating Florida law and FDOC rules, and the staff and administration were not enforcing the non-smoking laws and policies (doc. 24 at 8; doc. 55, Ex. H; doc. 57, Ex. M).  King complained that inmates assigned to the non-smoking quad were openly buying and bringing tobacco products into the quad (doc. 55, Ex. H; doc. 57, Ex. M).  He stated he had not observed any searches of inmates returning to non-smoking quads from the recreation yard to ensure that contraband or cigarette lighters were not present (*id.*).  King complained that officers walked through the non-smoking quad and completely ignored heavy cigarette smoke in the air and cigarette butts scattered on the day room floor (*id.*).  He complained that inmates continued to smoke as officers walked by them and threw cigarette butts on the floor without any investigation from staff (*id.*).  King acknowledged that on October 3, 2008, institutional staff posted non-smoking signs at several outdoor locations (including, the walls of the administration building, under the overhang outside the administration building, and from the medical department to the entrance to the "property hallway"), but he complained that non-smoking signs were not posted in <u>all</u> areas where smoking was prohibited by law (*id.*).  King identified several individual staff members whom he observed smoking on October 3, 6, and 9 in outdoor areas designated as non-smoking areas (*id.*).  King also complained to Warden Henry that on October 6, 2008, he observed Henry himself notice staff members smoking in a newly designated outdoor non-smoking area, and Henry's only comment was that it would take time for the new prohibitions to

"catch on" (*id.*).  In his grievance appeal, King told Warden Henry that the violations of the non-smoking laws and policies were causing him "health problems" (*id.*).

Warden Henry responded that GCF had designated two quads in the A-dormitory as non-smoking quads (meaning, inmates living there would not have the ability to purchase tobacco) (doc. 55, Ex. H).  He stated that security staff was policing the non-smoking quads to "ward off" incidents of inmates smoking there (*id.*).  In response to King's identifying several institutional staff members he observed smoking in prohibited areas, Warden Henry advised King to notify the correctional officer on duty of the names of violators, "so they can be dealt with accordingly" (*id.*).  Warden Henry additionally stated that inmates released from confinement would be placed in non-smoking quads regardless of whether they were smokers if that was where beds were available; and if those smoking inmates wished to be reassigned, every effort was being made to reassign them (*id.*).

On October 28, 2008, King was treated by Nurse Alexander (doc. 24 at 6).  According to King, Nurse Alexander noted that he had lost twelve (12) pounds, and she prescribed medications (*id.*).  King had a chest x-ray on October 30, 2008 (Kats-Kagan Aff. ¶ 7).  The x-ray showed that King's lungs were negative for any abnormalities and were free of any inflammatory of other infiltrative processes (*id.*).  King alleges he was examined by Nurse Alexander on November 17, 2008, and she noted that his symptoms "were comparable to asthma, or early emphysema" (doc. 24 at 6).

King states Defendant Zoley implemented a practice of using only one of two air handling units in each quad as a cost saving measure, which resulted in poor ventilation (doc. 24 at 11, 14).  On October 27–29, 2008, the Standards and Accreditation Department of the American Correctional Association ("ACA") conducted an audit of GCF (doc. 55, Ex. L, Affidavit of Sandra Miller ¶¶ 3–6).  The audit included GCF's compliance with ACA standard 4-4152, which addresses indoor air quality and requires that circulation be "at least ten cubic feet of fresh or re-circulated filtered air per minute per occupant for inmate rooms/cells, officer stations, and dining areas, as documented by an independent, qualified source" (*id.*, ¶ 6, Ex. 1).  GCF received 100% accreditation on all mandatory and non-mandatory standards, including the air quality standard (*id.*, ¶ 7, Ex. 2).

On February 23, 2009, King filed a grievance with Colonel Stewart regarding an inadequate supply of toilet paper (doc. 24 at 7; doc. 55, Ex. D).  Although King mentioned that inmates were

using toilet paper as wicks to light cigarettes in the quad, he did so as an example of one of the ways inmates were wasting toilet paper (*id.*).  He did not complain about exposure to ETS in the quad.[8] Colonel Stewart responded that the administration adjusted the toilet paper supply issue to cut down on waste and was in the process of adjusting it again, which should alleviate King's issue (*id.*).

Also on February 23, 2009, King voiced complaints about ETS to Nurse Alexander (doc. 24 at 6; Alexander Aff. ¶ 8).  Nurse Alexander treated numerous inmates housed in the non-smoking dormitory for various medical needs, but King was the only inmate who complained about inmates violating the non-smoking rules (Alexander Aff. ¶ 8).  According to medical department policy, if an inmate informed the medical department of the identity of someone smoking inside the dormitory, the medical department would turn over that name to security (Kats-Kagan Aff., ¶ 10; Alexander Aff. ¶ 9).  In Nurse Alexander's observation, the security staff always investigated and took remedial action whenever she passed along a concern (Alexander Aff. ¶ 5).  Nurse Alexander informed King that she would assist in having the inmates violating the non-smoking policy removed from the non-smoking quad  by anonymously forwarding a list of violators to security, if King would provide her a list of inmate violators (doc. 24 at 6; Alexander Aff. ¶¶ 8, 9, 10).  The parties dispute whether King actually provided Nurse Alexander with a list of inmate violators. King states he filed an inmate request with Nurse Alexander on February 23, 2009, and attached a list of twenty-one (21) inmates who were smoking in the non-smoking quad (doc. 24 at 6; doc. 57, Ex. B).  Nurse Alexander acknowledges that King sent her the inmate request, but she states King never provided her, either verbally or in writing, with names of those violating the non-smoking policy (Alexander Aff. ¶¶ 9, 10).  She additionally states that if she had forwarded a list of violators to security, she would have kept King's name confidential (*id.*, ¶ 10).  King states shortly after he submitted the list of names to Nurse Alexander, the identified inmates were removed from the non-smoking quad (doc. 24 at 6, 10).

In a grievance to Colonel Stewart dated March 29, 2009, King complained about the administration's decision to move all inmates receiving special diets to a quad that was not

---

[8] King underscored the phrase "burning wicks all night long to light cigarettes" in the copy of the grievance submitted with his Second Amended Complaint (doc. 24, Ex. C).  However, the phrase was not underscored in the grievance to which Colonel Stewart responded (*see* doc. 55, Ex. D).  It is evident that King added the underscore after Stewart issued his response.

designated as non-smoking (doc. 57, Ex. S).  King stated the medical department had strongly recommended he live in a non-smoking dorm and had told him his "other medical needs" would improve if he ate a vegan diet (*id.*).  Colonel Stewart responded that the decision regarding diet trays and housing came from "above me" (*id.*).  Stewart advised King to write to the warden if he was not willing to move and wished to receive a special diet tray (*id.*).  King then filed a grievance with Warden Henry on April 8, 2009, stating that on April 6, an assistant warden had approved his receiving a diet tray in the non-smoking quad, but the kitchen was not sending it (doc. 57, Ex. P).  On April 26, 2009, King sent Warden Henry another grievance concerning his failure to receive his special diet (doc. 57, Ex. O).  In that grievance, King stated that Nurse Alexander had "strongly recommended that I only be housed in [the non-smoking dormitory], due to my serious, life threatning [sic] conditions," and that a special diet would help him avoid future medication (*id.*).  Warden Henry responded on June 12, 2009, that according to institutional records, King's special diet tray had been sent to the non-smoking quad until April 17, 2009, when King was removed from the special diet program for failing to sign for his trays (doc. 57, Ex. P).

The medical staff never issued King a medical restriction pass due to any respiratory problems during the time he was at GCF while the facility was managed by The GEO Group (Kats-Kagan Aff. ¶ 8).  A medical restriction pass is documentation from the medical department notifying prison personnel that an inmate has a medical need requiring special accommodations (*id.*).  Nurse Alexander never viewed King as having any serious life threatening condition that required him to reside in a completely smoke-free environment (Alexander Aff. ¶ 7).  Neither Dr. Kats-Kagan nor Nurse Alexander ever informed Warden Henry or Colonel Stewart that King had a serious medical need or a life threatening condition relating to ETS or requiring him to reside in a completely smoke-free environment (Kats-Kagan Aff. ¶ 9; Alexander Aff. ¶ 7).  If medical staff had informed Warden Henry or Colonel Stewart that King had any serious medical need or any life threatening condition, either Defendant would have followed any recommendation they made (Henry Aff. ¶ 11; Stewart Aff. ¶ 14).  In Dr. Kats-Kagan's medical opinion, King's health did not deteriorate due to being housed in the non-smoking dormitory (Kats-Kagan Aff. ¶ 11).  Likewise, in Nurse Alexander's medical opinion, King's health did not deteriorate or become affected in any way due to his being housed in a non-smoking quad (Alexander Aff. ¶ 12).  Additionally, in Dr. Kats-Kagan's medical

opinion, it is impossible to medically determine whether any current smoking-related illnesses allegedly suffered by King were caused by his own past cigarette smoking or a variety of other past or current environmental conditions (Kats-Kagan Aff. ¶ 6).

According to King, Defendant Zoley approved all operational policies at GCF, including: (1) a policy requiring all inmates to remain in their quads a minimum of twenty-one (21) hours per day, (2) a policy permitting inmates only one (1) hour of recreation per day, and (3) a policy permitting the sale of tobacco at GCF (doc. 24 at 10–11, 14, 17, 18). King alleges Mr. Zoley also understaffed GCF and failed to adopt a policy providing for "smoke breaks" for inmates (*id.* at 11).

King filed the instant lawsuit on November 2, 2009 (doc. 1). The GEO Group, Inc. stopped managing GCF on September 27, 2010 (Henry Aff. ¶ 3).

III.    LEGAL STANDARDS

A.    <u>Summary Judgment Standard</u>

In order to prevail on their motion for summary judgment, Defendants must show that King has no evidence to support his case or present affirmative evidence that King will be unable to prove his case at trial. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of King's case, the burden shifts to King to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* King must show more than the existence of a "metaphysical doubt" regarding the material facts. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* <u>Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." <u>Young v. City of Palm Bay, Fla.</u>, 358 F.3d 859, 860 (11th Cir. 2004); *see also* <u>Celotex Corp.</u>, 477

U.S. at 324.  King must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by King in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  Nonetheless, King still bears the burden of coming forward with sufficient evidence of every element that he must prove. *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.     Eighth Amendment Standard

King appears to assert two bases for his Eighth Amendment claim concerning ETS.  First, Defendants were deliberately indifferent to his underline existing serious medical need; and second, Defendants deliberately exposed him to conditions which posed an unreasonable risk of serious damage to his future health.  With regard to the first aspect of his claim, that is, deliberate indifference to an existing medical need, King must satisfy both an objective and subjective inquiry. *See* Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  First, King must show an objectively serious medical need. *Id.*  Second, King must show that the prison official "acted with an attitude of 'deliberate indifference' to that serious medical need." *Id.*  A medical need is serious when it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quotation omitted). Deliberate indifference may be evidenced by the intentional interference of a prison official with medical treatment once it is prescribed.  Estelle v. Gamble, 429 U.S. 97, 104–05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976).

The standard applicable to the second type of claim, that is, deliberately exposing an inmate to conditions which pose an unreasonable risk of serious damage to his future health, also includes an objective and subjective component.  In order to establish this type of Eighth Amendment violation, King must show that Defendants have, "with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health."  Helling v. McKinney, 509 U.S. 25, 31, 35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993).  To show that the risk was objectively unreasonable, a prisoner must establish that he is being exposed to unreasonably high levels of ETS, and that the risk to his health is so grave as to violate contemporary standards of decency.  Id. at 35–36; see also Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005).  To establish deliberate indifference, the prisoner must show:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.  See Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).  "The adoption of a smoking policy will bear heavily on the inquiry into deliberate indifference."  Kelley, 400 F.3d at 1284 (quotation omitted).  Mere negligence is insufficient to establish deliberate indifference.  Id. at 1285.

However, supervisory officials are not liable under section 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.  See Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citations omitted).  Supervisory liability may occur either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.  Id. (citation omitted).  This connection may be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, or when a supervisor's custom or policy 'result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'"  Id. (internal quotation marks and citations omitted); Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999), cert. denied, 120 S. Ct. 1974, 146 L. Ed. 2d 804 (2000).

Isolated incidents are generally insufficient to establish a supervisor's liability; indeed, the deprivations must be "'obvious, flagrant, rampant and of continued duration . . . .'"  Gray ex rel.

Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).  Furthermore, filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the grievance, even if the grievance is denied.  Wayne, 197 F.3d at 1106; Weaver v. Toombs, 756 F. Supp. 335, 337 (W.D. Mich. 1989), aff'd, 915 F.2d 1574 (6th Cir. 1990); see also Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).  Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson County Com'n, 10 F.3d 1535, 1542 (11th Cir. 1994).  The failure to act or implement policy must be in the face of repeated violations or other indicators signifying a strong likelihood that the situation will recur.  See Harris v. City of Marion, 79 F.3d 56, 58–59 (7th Cir. 1996).  Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary.  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Cottone, 326 F.3d at 1360 (internal quotation marks and citation omitted).

IV.    ANALYSIS

    A.    Defendant Zoley

        As discussed in the previous Report and Recommendation (doc. 52), King's allegations fail to state a basis for liability as to Defendant Zoley.[9]  None of the policies or customs cited by King, considered individually or collectively, were facially unconstitutional or authorized inmates living in non-smoking quads to be exposed to ETS, let alone levels of ETS that posed an unreasonable risk of serious damage to their health.   Furthermore, King's allegations fail to show that Zoley implemented the policies with "deliberate indifference" to their known or obvious consequences. See Bd. of Cnty. Comm'r of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404–05, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); McDowell v. Brown, 392 F.3d 1282, 1290–92 (11th Cir. 2004).  At most, the allegations may suggest negligence; however, negligence, either simple or heightened, does not suffice to impose liability under § 1983.  See Brown, 520 U.S. at 407 ("A showing of simple or even

_____

[9] As previously noted, the district judge provided King an opportunity to amend his complaint in an effort to allege sufficient facts to state a claim against Zoley, but King did not avail himself of this opportunity.

heightened negligence will not suffice.").  Additionally, King failed to present evidence from which a reasonable fact finder could conclude that Defendant Zoley was aware of widespread violations of, or failures to enforce, the non-smoking policies.  Therefore, as the undersigned previously concluded, and the district judge agreed, King has failed to state an Eighth Amendment claim against Defendant Zoley.

      B.     <u>Defendants Henry and Stewart</u>

      The court will first address King's claim that Warden Henry and Colonel Stewart were deliberately indifferent to his existing serious medical need to avoid ETS.  Defendants argue King cannot show he had an existing serious medical need to avoid ETS.  In support of their argument, they submitted affidavits from Dr. Kats-Kagan and Nurse Practitioner Alexander, both of whom treated King during the relevant time period.  Nurse Alexander states she never viewed King as having any serious life threatening condition that required him to reside in a completely smoke-free environment.  Both medical professionals opined that King did not have a serious medical need or a life threatening condition relating to ETS.

      Additionally, Defendants contend King cannot show a causal connection between his ETS exposure and the worsening of any preexisting medical condition.  Defendants proffered Dr. Kats-Kagan's medical opinion that King's health did not deteriorate due to being housed in the non-smoking quad, and that it is medically impossible to determine whether any alleged smoking-related illnesses are related to a person's previous smoking or to current exposure to ETS.  Nurse Alexander also opined that King's health did not deteriorate or become affected in any way due to being exposed to ETS in the quad.

      King has not proffered any medical evidence, even his own medical records, documenting a medical condition or a worsening of any existing medical condition.  His layman's allegations that his health worsened as a result of ETS exposure are insufficient to defeat Defendants' motion for summary judgment on this essential element of his claim.  Therefore, Warden Henry and Colonel Stewart are entitled to summary judgment on King's Eighth Amendment claim that they were deliberately indifferent to his existing serious medical need to avoid ETS.

      The court will next address King's claim that Defendants were deliberately indifferent to his future serious medical need to avoid ETS.  On the issue of the level of ETS to which King was

exposed, King described it as "harmful" and "high" in his verified Second Amended Complaint (doc. 24 at 13, 15, 21–24). Defendants argue King cannot produce evidence to satisfy the objective component, that is, he was exposed to unreasonably high levels of ETS, and that the risk to his health was so grave as to violate contemporary standards of decency. Defendants submitted the results of an air quality audit of GCF on October 27–29, 2008, during the time King was complaining of unreasonably high levels of ETS. The audit found that GCF was in 100% compliance with ACA standards regarding air quality. Additionally, Nurse Alexander stated she treated numerous inmates housed in the non-smoking dormitory for various medical needs, but King was the only inmate who complained about ETS in the dormitory, which reasonably suggests the level of ETS was not unreasonably high. To rebut Defendant's evidence, King offered nothing but his own, self-serving, unverified statements that he was exposed to unreasonably high levels of ETS (*see* doc. 57). This is insufficient to show a genuine issue of material fact as to whether he was exposed to unreasonably high levels of ETS.

On the issue of whether the risk to King's health was so grave as to violate contemporary standards of decency, Defendants proffered Dr. Kats-Kagan's medical opinion that King's health did not deteriorate due to being housed in the non-smoking quad, and that it is medically impossible to determine whether any alleged smoking-related illnesses are related to a person's previous smoking or to current exposure to ETS. King states he will produce expert evidence at trial, in the form of a Surgeon General's report and a report from the World Health Organization, showing that even brief exposure to ETS causes immediate bodily harm and may cause lung cancer, heart attack, heart disease, respiratory diseases, and death (doc. 57 at 8). King did not submit the reports as summary judgment evidence. Furthermore, according to King's description of the content of the reports, they underscore general health risks associated with ETS; however, this evidence does not objectively establish King's individual and particular level of exposure or attendant risk. Therefore, King has failed to show a genuine issue of material fact as to whether the risk to his future health is so grave as to violate contemporary standards of decency.

Even if King satisfied the objective component of the Eighth Amendment standard, he still failed to show, subjectively, that Warden Henry or Colonel Stewart acted with deliberate indifference. Warden Henry and Colonel Stewart proffered their own affidavits attesting they were

never informed by medical staff that exposure to ETS posed a serious risk of harm to King's health. Defendants additionally proffered the affidavits of Dr. Kats-Kagan and Nurse Alexander stating the medical staff never issued King a medical restriction pass due to any respiratory problems during the time he was at GCF while the facility was managed by The GEO Group, and neither medical professional ever informed Warden Henry or Colonel Stewart that King had a serious medical need or a life threatening condition relating to ETS or requiring him to reside in a smoke-free environment.  The only evidence King proffered that suggests Warden Henry or Colonel Stewart was informed by medical staff, either directly or indirectly, that exposure to ETS created a serious risk of harm to his future health, was King's grievances in March and April of 2009, the contents of which are described *supra* (*see* doc. 57, Exs. E, F).  Those grievances concerned King's removal from the vegan diet program in the non-smoking quad, not any exposure to ETS.  King's mention of Nurse Alexander's alleged recommendations that he be housed in the non-smoking quad and that a vegan diet may help him avoid future medication was insufficient to alert either Colonel Stewart or Warden Henry that King was being exposed to unreasonably high levels of ETS and that the exposure posed a serious risk of harm to his health.

Also relevant to the subjective component, Defendants argue neither Warden Henry nor Colonel Stewart disregarded King's complaints of ETS.  In support of their argument, Defendants submitted their own affidavits attesting that GCF had a policy prohibiting smoking indoors even prior to King's arrival at GCF.  Additionally, their affidavits attest that although they were aware that smoking was occurring in the dormitories, they responded to the problem by creating the non-smoking quads and implementing policies to investigate and punish violators of the non-smoking policies.

King attempts to show Defendants' deliberate indifference by submitting copies of the grievances he filed September 21, September 27, and October 9, 2008, the contents of which are described *supra* (doc. 57, Exs. C, M, N).  However, Colonel Stewart and Warden Henry's responses to King's complaints do not suggest deliberate indifference.  Colonel Stewart responded that inmates were no longer being placed in the non-smoking quad when they were discharged from confinement unless they had been previously housed there and were non-smokers; he acknowledged that smoking was prohibited inside the buildings and assured King that staff did not permit smoking in the dorms

and disciplined violators; he stated that staff was advised where smoking was permitted; and King admits that numerous non-smoking signs were posted in the facility after he filed the grievances with Stewart.  Stewart thus took steps to correct some of the problems identified by King.  Warden Henry responded to King's grievance by assuring him that security staff was addressing the issue of inmates smoking in the quads by policing their areas to "ward off" such incidents; and he encouraged King to notify the correctional officer on duty when he observed violators and "they [would] be dealt with accordingly."  Warden Henry's acknowledgment that inmates who were known to smoke were sometimes placed in a non-smoking quad to satisfy institutional housing needs does not constitute approval of actual smoking indoors, nor does it suggest a deliberate failure to enforce non-smoking laws or policies.

Additionally, it is undisputed that King never <u>directly</u> identified inmate violators to either Warden Henry or Colonel Stewart, despite their urging King to do so.  Although there is sufficient evidence to create a genuine issue of material fact as to whether King <u>indirectly</u> provided Warden Henry or Colonel Stewart with a list of inmate violators (anonymously through Nurse Alexander), King admits that shortly after he provided the list, all of those inmates were removed from the non-smoking quad.  With regard to smoking violations by correctional staff, King submitted evidence that he complained to Warden Henry on October 9, 2008, that specific members of the correctional staff were smoking on October 3, 6, and 9 in <u>outdoor</u> areas officially designated as non-smoking (doc. 55, Ex. H; doc. 57, Ex. M).  However, the fact that the alleged violations occurred outdoors and in areas that had been newly designated as non-smoking suggests, at most, negligent enforcement by Warden Henry; those facts do not suggest Henry deliberately exposed King to an unreasonably high level of ETS.

Moreover, even considering King's allegations of conduct that occurred <u>after</u> the filing of this lawsuit, his allegations fail to suggest deliberately indifferent conduct by Warden Henry or Colonel Stewart. King submitted a copy of a grievance he filed with Colonel Stewart on June 1, 2010, after this lawsuit had been pending for seven (7) months (*see* doc. 57, Ex. R).   King complained that inmates were purchasing smoking products and bringing them into the quad, which was considered contraband in the non-smoking quad; and they were smoking in the quad without fear of being removed or their tobacco confiscated (*id.*).  He complained that over the past three or

four months, ninety percent (90%) of the inmates newly assigned to the quad were smokers, but he acknowledged that the majority of inmates in the quad were non-smokers (*id.*).  King told Stewart that Nurse Alexander had strongly recommended that he be assigned to a smoke-free environment, and the smoke in the quad was making him sick (*id.*).  On June 6, 2010, Colonel Stewart responded that all dorms were supposed to be non-smoking; the security staff was trying to provide a tobacco free quad, but if they did not see inmates smoking, they could not stop it; and if King provided names and room numbers of violators, security would investigate (*id.*).  King appealed Stewart's denial of his grievance to Warden Henry (doc. 57, Ex. Q).  On June 14, 2010, Warden Henry denied King's appeal on the ground that Colonel Stewart's response adequately addressed the issues raised in the grievance (*id.*).  Defendants' response of encouraging King to report violators so they could be investigated was reasonable and does not suggest deliberate indifference, especially since this was the first time King had complained about smoking violations in his quad in sixteen (16) months (since February of 2009, when he allegedly supplied a list of violators to Nurse Alexander).  Further, King's grievance did not suggest he had brought the smoking violations to the attention of Defendants' subordinates or that he had utilized the available procedure for anonymously reporting violators.  King's personal observations of violations of the non-smoking policies establish imperfect or, at most, negligent enforcement of the non-smoking policy, but they do not suggest deliberate indifference by Colonel Stewart or Warden Henry.  Viewing the facts viewed in the light most favorable to King, no reasonable juror could conclude that Warden Henry or Colonel Stewart was deliberately indifferent to King's future health.

Based upon the foregoing, Warden Henry and Colonel Stewart are entitled to summary judgment on King's Eighth Amendment claims of deliberate indifference to his existing medical condition or his future health.  *See* Kelley v. Hicks, 400 F.3d 1282, 1285 (11th Cir. 2005) (affirming district court's grant of summary judgment for defendants; prisoner failed to establish that warden and assistant warden were deliberately indifferent to his future health in violation of the Eighth Amendment by allowing him to be exposed to harmful levels of environmental tobacco smoke (ETS) while he was incarcerated; facility had a no-smoking policy in place, and any inmate caught smoking inside would be disciplined; prisoner offered only his personal observations of smoke inside prison which, at most, established that warden and assistant warden were negligent in

enforcing non-smoking policy); *see also, e.g.,* Morefield v. Brewton, No. 10-11665, 2011 WL 3518051, at *2 (11th Cir. Aug. 11, 2011) (unpublished) (affirming district court's grant of summary judgment for defendants; with respect to inmate's preexisting medical condition, inmate failed to provide any evidence to establish necessary causal connection between ETS exposure and alleged injuries; inmate's own conclusory allegations that his medical conditions worsened as a result of ETS exposure, or that exposure caused coughing, sleep deprivation, watery eyes, and breathing problems, were insufficient to defeat summary judgment motion; with respect to inmate's future health, inmate failed to show he was exposed to sufficiently "grave" levels of ETS to satisfy objective component of Eighth Amendment standard where he never alleged he shared a cell with a smoker, institution had no-smoking policy and punished violators, inmate failed to proffer any evidence other than his own self-serving statements showing that ventilation was insufficient, and inmate spent only two months in building with allegedly high levels of ETS; inmate also failed to show defendants acted with deliberate indifference; rather, inmate's personal observations that inmates smoked inside building after inspections showed, at most, negligence in enforcing no-smoking policy); Brown v. Head, No. 05-15891, 190 Fed. Appx. 808, 810, 2006 WL 2034735, at *1–2 (11th Cir. 2006) (unpublished) (affirming district court's grant of summary judgment for defendants; inmate failed to show that prison administrator violated Eighth Amendment by denying his request to be placed in space free of ETS where record showed that administrator's staff investigated inmate's grievance and responded accordingly; lack of enforcement of existing smoking policy at best showed mere negligence); Jones v. Caruso, No. 10-1515, 421 Fed. Appx. 550, 552, 2011 WL 1586075, at *2 (6th Cir. Apr. 28, 2011) (unpublished) (affirming district court's grant of summary judgment to defendants; prisoner's exposure to ETS was not a serious health threat, as would violate the Eighth Amendment, even though prisoner suffered from asthma, where his asthma symptoms were relatively minor and could be managed with inhalers and other medications, and prisoner's medical records did not indicate that he suffered from exposure to ETS); Durham v. Hood, No. 10-1128, 412 Fed. Appx. 127, 130, 2011 WL 465519, at *2 (10th Cir. Feb. 10, 2011) (unpublished) (affirming district court's grant of summary judgment to defendants; inmate plaintiff's submission of various regulations and reports pertaining to ETS exposure underscored general health risks associated with ETS but failed to objectively establish inmate's individual and particular level

of exposure or attendant risk; inmate's anecdotal testimony of his exposure and symptoms he claimed to have suffered as a result likewise failed to objectively establish his exposure level); Slaughter v. Rogers, No. 10-2911, 408 Fed. App. 510, 512, 2010 WL 4016981, at *2 (3d Cir. Oct. 14, 2010) (unpublished) (affirming district court's grant of summary judgment to defendants; inmate plaintiff failed to demonstrate deliberate indifference on defendants' part where defendants provided evidence showing the existence of an institutional smoking policy issued with "particular concern [to] the risks posed to nonsmokers by passive inhalation of environmental tobacco smoke"; defendants also furnished evidence demonstrating citations for violation of the policy, correspondence acknowledging receipt and consideration of plaintiff's complaints, and memoranda emphasizing the seriousness of the policy and penalties for infractions; these responses by prison authorities, indicating attentiveness to the policy and awareness of and disciplining of violators—if not necessarily total success in enforcement—suggest that defendants took plaintiff's complaints seriously, and plaintiff did not provide sufficient evidence to dispute this conclusion); Taylor v. Conway, No. 08-5602, 381 Fed. Appx. 40, 40–41, 2010 WL 2500647, at *1 (2d Cir. June 18, 2010) (unpublished) (affirming district court's grant of summary judgment to defendants where inmate failed to demonstrate his exposure to ETS was unreasonably high); Davis v. Hawthorne, No. 2:05cv21-MEF, 2007 WL 1266877, at *4 (M.D. Ala. May 1, 2007) (unpublished) (granting summary judgment for defendants; assuming *arguendo* that inmate could show that asthmatic condition was exacerbated by ETS, thereby satisfying objective component of Eighth Amendment standard, she failed to satisfy subjective component in light of undisputed evidence that prison regulations prohibited smoking in prison facilities and provided that inmates caught smoking were subject to disciplinary action; while inmate alleged that inadequate staffing provided inmates with opportunities to smoke indoors, at most, her claim alleged "imperfect enforcement" of non-smoking policy which showed at worst negligence but not deliberate indifference); Smith v. Looney, No. CV 304-142, 2006 WL 4091209, at *4 (S.D. Ga. Aug. 11, 2006) (unpublished) (granting summary judgment for defendants; inmate failed to satisfy subjective component of Eighth Amendment claim that defendants were deliberately indifferent to future medical needs by causing him to be exposed to ETS where defendants encouraged plaintiff to report anyone violating prison's no-smoking policy; prison officials also moved plaintiff to a two-inmate cell because of his complaints, and

ultimately he was moved from the prison altogether; presence of no-smoking policy, even if imperfectly enforced, and actions taken by prison officials to lessen plaintiff's ETS exposure demonstrate that defendants did not act with deliberate indifference to plaintiff's future medical condition); Lewis v. Jarriel, No. CV 304-96, 2006 WL 839390, at *4 (S.D. Ga. Mar. 24, 2006) (unpublished) (granting summary judgment for defendants; inmate failed to satisfy subjective component of Eighth Amendment standard where evidence showed that defendant warden had spoken to plaintiff directly on one occasion about his complaints of ETS, and the deputy warden met with plaintiff on two occasions; in response to plaintiff's complaints, prison staff reissued memoranda on prison's smoking policy and encouraged plaintiff to report violations; plaintiff must allege something more than imperfect enforcement of smoking policy in order to state deliberate indifference claim, and he failed to do so).[10]

Other federal courts of appeals have found that the prisoner plaintiff's evidence regarding exposure to ETS was sufficient to survive summary judgment on an Eighth Amendment claim, but in significantly distinguishable circumstances (those significantly distinguishable facts are underlined *infra*). *See* Atkinson v. Taylor, 316 F.3d 257, 264–69 (3d Cir. 2003) (prison officials were not entitled to qualified immunity from inmate's claim that they were deliberately indifferent to his medical needs, in violation of Eighth Amendment rights, resulting from his exposure to ETS; right of prisoner not to be subjected to unreasonable risk of present injury from ETS was clearly established, and there was evidence that inmate was housed for over seven months with "constant" smokers, that he suffered numerous symptoms as a result and that, after telling prison officials about his sensitivity to ETS, no change was made in his housing conditions); Davis v. New York, 316 F.3d 93, 100–01 (2d Cir. 2002) (inmate's assertions may be sufficient to create genuine issue of material fact as to whether he was exposed to unreasonable levels of second-hand smoke where inmate alleged that during six-year period, he had always been housed in areas where majority of inmates were smokers; in his housing block he was surrounded by seven inmates who were chain smokers or frequent smokers, such that "the smell of smoke fills the air and enter[s] my cell in a manner as

---

[10] The undersigned cites unpublished Eleventh Circuit opinions, opinions of other federal courts of appeals, and opinions of other district courts in the Eleventh Circuit only as persuasive authority and recognizes they are not binding on this court.

though I was myself smoking"; and smoke caused him to suffer dizziness, difficulty breathing, blackouts, and respiratory problems); Wilson v. Burks, No. 09-2827, 423 Fed. Appx. 169, 2011 WL 1426575, at *4–5 (3d Cir. Apr. 14, 2011) (unpublished) (genuine issue of material fact existed concerning whether defendant was deliberately indifferent to the risk of inmate plaintiff's exposure to unreasonably high levels of ETS; affidavits of plaintiff's current and former cellmates called into question the court's finding that inmate failed "to identify one instance when one inmate smoked one cigarette, much less one specific incident where defendant [ ] failed to enforce the no-smoking policy"; both affiants witnessed second-hand smoke "lingering everyday on the block," suggesting that plaintiff's exposure to ETS was a pervasive, everyday affair; moreover, the inmate affidavits raised a factual issue as to whether the small number of disciplinary citations issued for violations of the non-smoking policy meant that exposure to second-hand smoke was occasional or whether the smoking ban was just poorly enforced; plaintiff's grievance also alerted defendant to the fact that he had been given radiation treatment, and that he had been told by a doctor that he should not be around people who are smoking); Hauman v. Sec'y Pennsylvania Dep't of Corr., No. 09-4038, 421 Fed. Appx. 235, 238, 2011 WL 1226949, at *2–3 (3d Cir. Apr. 4, 2011) (reversing district court's grant of summary judgment for defendants where record included documentation of plaintiff's respiratory condition during relevant period; defendants conceded EPA issued notice of violation based on particulate matter emissions from prison's coal-burning boiler plant; and defendants acknowledged that asbestos-containing materials were present at prison and release of friable asbestos occurred in prison during pendency of lawsuit).

V.    CONCLUSION

Upon consideration of King's claims and the evidence submitted, the undersigned concludes that King's claims against Defendant Zoley should be dismissed with prejudice for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  As to King's Eighth Amendment claims against Defendants Henry and Stewart, King failed to show a genuine issue of material fact as to any essential element of his claims, and Defendants are entitled to judgment as a matter of law.  Therefore, Defendants' motion for summary judgment should be granted.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Plaintiff King's claims against Defendant Zoley be **DISMISSED with prejudice** for failure to state a claim on which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

2.      That Defendants Henry and Stewart's motion for summary judgment (doc. 55) be **GRANTED**.

3.      That this action be **DISMISSED** and the clerk be directed to enter judgment in favor of Defendants and close the file.

At Pensacola, Florida, this 19th day of September 2011.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only</u>.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**